*Jamal Antoine Williams v. State of Maryland*, No. 44, September Term, 2024. Opinion by Biran, J.

**CRIMINAL ORGANIZATIONS – MD. CODE ANN., CRIM. LAW ("CR") § 9-805 (2002, 2012, 2021 REPL. VOL.) –** *MENS REA* **ELEMENT –** The Supreme Court of Maryland held that CR § 9-805 is a general intent crime and not a specific intent crime. To obtain a conviction under CR § 9-805, the State must prove that the defendant knew the organization he or she was organizing, supervising, promoting, sponsoring, financing, or managing was a "criminal organization" as defined in CR § 9-801(c). That, in turn, requires proof of the defendant's knowledge that: (1) the organization is an "enterprise," as further defined in CR § 9-805(d); (2) the members of the organization engage in a "pattern of organized crime activity," as further defined in the CR § 9-801(e); (3) the members have as one of their primary objectives or activities the commission of one or more "underlying crimes," as that term is further defined in CR § 9-801(g); and (4) the members have in common an overt or covert organizational or command structure.

**SUFFICIENCY OF THE EVIDENCE – CR § 9-805 –** The Supreme Court held that the General Assembly intended CR § 9-805 to reach only those who exercise a leadership role in a criminal organization or – if they are not members of a criminal organization – exercise discretionary authority in connection with the act covered by § 9-805(a). Here, the State introduced evidence that Petitioner: (1) stood watch while a gang leader spray-painted a gang-related message on public property; and (2) posed for pictures in front of the graffiti. There was no evidence that Petitioner had a leadership role in the criminal organization or exercised any discretionary authority in connection with the prohibited act. Accordingly, the Court held that the evidence was insufficient to sustain Petitioner's conviction under CR § 9-805 for promoting a criminal organization.

IN THE SUPREME COURT

OF MARYLAND

No. 44

September Term, 2024

---

JAMAL ANTOINE WILLIAMS

v.

STATE OF MARYLAND

---

Fader, C.J.
Booth
Biran
Gould
Eaves
Killough
Getty, Joseph M.
  (Senior Justice, Specially Assigned),

JJ.

---

Opinion by Biran, J.
Gould and Getty, JJ., dissent.

---

Filed: July 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In 2010, the General Assembly revamped Maryland's laws targeting criminal gang activity. This came in response to reports that, as of early 2010, there were 600 active gangs in the State with over 11,000 members. To address this problem, the General Assembly, among other things, made it a felony to "organize, supervise, finance, or manage a criminal gang." 2010 Md. Laws 1464 (ch. 197), *codified at* Md. Code Ann., Crim. Law ("CR") § 9-805(a) (2002, 2012 Repl. Vol.). The verbs in this prohibition resembled the nouns in the definition of "[d]rug kingpin" in the "[d]rug kingpin" statute: "organizer, supervisor, financier, or manager[.]" CR § 5-613 (2002). The sponsor of the amendment that included what became CR § 9-805 referred to it as a "gang kingpin" offense. However, unlike the drug kingpin statute, there was no reference in the text of § 9-805 to a "kingpin."

In 2016, the General Assembly amended CR § 9-805, adding "promote" and "sponsor" to the list of prohibited acts. 2016 Md. Laws 6404 (ch. 515). The General Assembly revised the statute again in 2020, replacing the term "criminal gang" with "criminal organization." 2020 Md. Laws 2212 (ch. 422). Thus, the statute currently makes it a felony to "organize, supervise, promote, sponsor, finance, or manage a criminal organization." CR § 9-805(a) (2021 Repl. Vol.).[1] A "criminal organization" is defined as an enterprise whose members, among other things, have as one of their primary objectives or activities the commission of certain crimes. *See id.* § 9-801(c).

In May 2022, the State charged Petitioner Jamal Antoine Williams under CR § 9-805, alleging that he "promote[d] a criminal organization[.]" The criminal organization Mr.

---

[1] Unless otherwise indicated, we cite to this edition of the Criminal Law Article.

Williams was alleged to have promoted was the Rollin 30s Crips, which is a set of the transnational gang known as the Crips. Mr. Williams's alleged act of promotion was standing watch while a leader of the gang spray-painted the message "Roll Three N 30s Crip" on a wall at Veteran's Plaza in Silver Spring, Maryland. After Mr. Williams waived a jury trial and the parties stipulated to the relevant facts, a Montgomery County Circuit Court judge found Mr. Williams guilty of promoting a criminal organization, in violation of CR § 9-805. Mr. Williams appealed his conviction, and the Appellate Court of Maryland affirmed. Mr. Williams then sought further review in this Court.

We hold that, to obtain a conviction under CR § 9-805, the State must prove the defendant had knowledge that the organization the defendant organized, supervised, promoted, sponsored, financed, or managed was, in fact, a "criminal organization" within the meaning of the statute. We further hold that the General Assembly intended CR § 9-805 to apply only to individuals who exercise a leadership role in the criminal organization or – if they are not members of the criminal organization – exercise discretionary authority with respect to the commission of the offense. The State failed to prove that Mr. Williams exercised a leadership role in the Rollin 30s Crips or exercised discretionary authority with respect to the defacing of the wall at Veteran's Plaza. Accordingly, we reverse his conviction under CR § 9-805.

## I

In May 2022, a Montgomery County grand jury indicted Mr. Williams on four counts. Count One charged Mr. Williams with promoting a criminal organization, in violation of CR § 9-805. The other three counts charged Mr. Williams with conspiracy to

promote a criminal organization; malicious destruction of property having a value of at least $1,000; and conspiracy to commit malicious destruction of property.

On February 15, 2023, in the Circuit Court for Montgomery County, Mr. Williams waived a jury trial and pled not guilty with an agreed statement of facts to Count One of the Indictment – the count that alleged he "promot[ed]" a criminal organization, in violation of CR § 9-805. The stipulated facts were:

> [O]n December 7th, 2021, a brick wall at the Silver Spring[] Civic Center's Veteran's Plaza was defaced with graffiti. The graffiti read Roll Three N 30s Crip, and was painted with blue spray paint.
>
> [The manager of the Civic Center] informed the Montgomery County Police Department that the graffiti was unauthorized, and maliciously destroyed and defaced the wall at the center. He also informed the Montgomery County Police Department that it cost $1,080 to remove the graffiti and restore the wall.
>
> The Montgomery County Police Department assigned two detectives to investigate. Through their training and experience, they recognized the graffiti to reference the Rollin 30s Crips, a set of the [C]rips transnational street gang, a criminal organization. Some members of which have committed murder, rape, extortion, drug distribution and human trafficking. As well as kidnapping, fraud, prostitution, and other crimes.
>
> The [C]rips formed in Los Angeles, California in 1969, and have since spread nationally and internationally. Some national divisions of the [C]rips are often formed in a particular neighborhood, named for that neighborhood. And then sometimes expand their reach beyond the neighborhood.
>
> The Rollin 30s Crip set formed in Los Angeles[,] spread actually to Belize, and then to New York City, New York. They have since expanded nationally, and the [C]rips use numerous hand signs to identify themselves to fellow members and rivals.
>
> [The Crips are] [o]ften associate[d] with the color blue. Rivals of the [B]loods who wear red, and identify themselves as members that way. The Rollin 30s Crips are sometimes referred to as the original Harlem Crips or dirt gang, and they sometimes throw or display hand signs which incorporate

3

an H or a D. H for Harlem. D for dirt gang. Criminal gangs often use graffiti to mark their territory and to promote and enhance their reputation.

The investigating detectives obtained video surveillance of Veteran's Plaza, which showed three men approaching the plaza wall at approximately 7:00 pm on December 7th, 2021. The detectives were able to identify the three men based on their distinctive clothing, which all three wore in multiple social media posts.

Marcus Dowdy (phonetic sp.) wearing a blue puffy coat, actually spray painted the wall at Veteran's Plaza. Jamal Williams, the defendant in this case, and Doncris Mussimi (phonetic sp.) stood watch.

After the tag had been sprayed, all three men posed for photographs with the graffiti, and displayed hand signs. The defendant did not post any images of the graffiti to social media.

After determining that Mr. Dowdy, Mr. Williams and Mr. Mussimi were the three men involved in the painting and graffiti at Veteran's Plaza, to promote the Rollin 30s Crips, the detectives obtained arrest warrants for the three men.

When Mr. Dowdy was taken into custody, he was searched. Inside a satchel slung over his shoulder was a Bryco Arms Model J-22, 22 caliber handgun, with a cartridge loaded in the chamber. Dowdy was previously convicted of robbery in case CT-09-1103A, in the Circuit Court for Prince George's County. Mr. Dowdy admitted being a member of the Rollin 30s Crips.

When Mr. Williams was taken into custody, he admitted previous membership in the [C]rips, and was wearing a blue shirt and a blue sock on his left foot. Crips often wear blue on the[] left side[] of their body[] to indicate membership. Mr. Williams identified Mr. Dowdy as the leader of their individual set.

Mr. Williams is seen on social media displaying hand signs, and Mr. Williams and Mr. Dowdy have been in communication via telephone while Mr. Dowdy was incarcerated.

Mr. Mussimi has also posted on social media displaying clothing, hand signs, and references promoting the Rollin 30s Crips.

4

Based on the foregoing, all three men were validated as members of the Rollin 30s Crips by the Montgomery County Police Department. And all of those events … occurred in Montgomery County, Maryland.

Based on these stipulated facts, the circuit court found Mr. Williams guilty. The court imposed a sentence of five years' incarceration, with all but six months suspended, followed by supervised probation. The court also ordered Mr. Williams to pay restitution to Montgomery County in the amount of $360, representing one-third of the cost to remove the graffiti.

Mr. Williams timely appealed his conviction to the Appellate Court of Maryland, arguing that the agreed-upon facts were legally insufficient to support his conviction. The Appellate Court affirmed. *Williams v. State*, 263 Md. App. 507 (2024). The court rejected Mr. Williams's argument that the State failed to prove that he "promote[d]" the Rollin 30s Crips by standing watch while Mr. Dowdy painted the gang-related message. Relying on dictionary definitions of "promote" – including to "support or actively encourage (a cause, venture, etc.); further the progress of" – the Appellate Court held that Mr. Williams promoted the gang. *Id.* at 521-24. The court emphasized that Mr. Williams acted as "more than a mere bystander," *id.* at 524, and that the spray-painted message "worked to advertise the Rollin 30s Crips, thereby strengthening its reputation and furthering the interests of the gang." *Id.*

The court rejected Mr. Williams's arguments that CR § 9-805: (1) applies only to leaders of criminal organizations – so-called "kingpins," *id.* at 522-23; (2) is a specific intent offense, *id.* at 524-26; and (3) requires a prerequisite of being found guilty of

5

committing the offense of participation in a criminal organization under CR § 9-804.[2] *Id.* at 517, 526-28.

Mr. Williams petitioned this Court for a writ of *certiorari*, which we granted on January 27, 2025. *Williams v. State*, 489 Md. 329 (2025). He presents the following questions for our review, which we have rephrased:

1.  What must the State prove with respect to a defendant's knowledge or intent in order to convict the defendant under CR § 9-805(a)?

2.  Was the evidence sufficient to convict Mr. Williams of promoting a criminal organization?

## II

In reviewing the sufficiency of the evidence, this Court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis deleted); *accord State v. McGagh,*

---

[2] Section 9-804 provides that a person may not:

(1) participate in a criminal organization knowing that the members of the criminal organization engage in a pattern of organized crime activity; and

(2) knowingly and willfully direct or participate in an underlying crime, or act by a juvenile that would be an underlying crime if committed by an adult, committed for the benefit of, at the direction of, or in association with a criminal organization.

CR § 9-804(a). An "underlying crime," in turn, is defined in CR § 9-801(g) and includes numerous criminal offenses under Maryland law and similar offenses under federal law and the laws of other states.

472 Md. 168, 193 (2021). We review questions of statutory interpretation *de novo*. *See, e.g.*, *Lawrence v. State*, 475 Md. 384, 398 (2021).

III

As we have often stated, our goal in interpreting a statute is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Rowe v. Maryland Comm'n on Civil Rights*, 483 Md. 329, 342 (2023) (quoting *Matter of Collins*, 468 Md. 672, 689 (2020)). We begin with the statute's plain language. *See Buarque de Macedo v. Auto. Ins. Co. of Hartford, Conn.*, 480 Md. 200, 215 (2022). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resorting to other rules of construction." *Bennett v. Harford Cnty.*, 485 Md. 461, 485 (2023) (internal quotation marks and citations omitted).

However, we do not "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. As such, we may look to related statutes, earlier and subsequent enactments, and other materials that bear on legislative purpose. *See Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 512 (2021). "We presume that the legislature intends its enactments to work together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Cherry v. Mayor & City*

7

*Council of Balt.*, 475 Md. 565, 597 (2021) (internal quotation marks and citations omitted); *see also Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302-03 (2001) ("[W]hen interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme.").

Where the words of a statute are ambiguous on their face, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, "a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Bennett*, 485 Md. at 486 (citations omitted). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276.

**IV**

**A**

Criminal Law Article Title 9, Subtitle 8, is entitled "Criminal Organizations" ("Subtitle 8"). The General Assembly enacted the provisions of Subtitle 8 to combat organized crime. Subtitle 8 bears similarities to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which Congress passed in 1970 to fight organized crime at the federal level. *See* 18 U.S.C. §§ 1961-1968.

Much of what is currently in Subtitle 8 was added as a result of 2010 amendments. At that time, among other things, the General Assembly added CR § 9-805, which in subsection (a) made it a felony to "organize, supervise, finance, or manage a criminal gang." 2010 Md. Laws 1464 (ch. 197). The maximum penalties for a violation of § 9-805(a) initially were 20 years of imprisonment and a $100,000 fine. *See* CR § 9-805(b) (2002, 2012 Repl. Vol.).

In 2016, the General Assembly revised CR § 9-805 as part of the broader Justice Reinvestment Act.[3] Most relevant here, the General Assembly added "promote" and "sponsor" to the list of prohibited acts in CR § 9-805(a). 2016 Md. Laws 6404 (ch. 515). Thus, after the 2016 amendment, subsection (a) provided: "A person may not organize, supervise, promote, sponsor, finance, or manage a criminal gang." CR § 9-805(a) (2002, 2012 Repl. Vol., 2016 Supp.). The General Assembly also increased the maximum fine for a violation of subsection (a) to $1,000,000. *Id.* § 9-805(b).

The General Assembly revised the statute again in 2020, replacing the term "criminal gang" with "criminal organization" throughout the subtitle. *See* 2020 Md. Laws 2212 (ch. 422). Section 9-805(a) now provides that a person may not "organize, supervise, promote, sponsor, finance, or manage a criminal organization." A "criminal organization" is defined in CR § 9-801(c) as

---

[3] The Justice Reinvestment Act was part of the General Assembly's effort to reduce Maryland's prison population and use the resulting monetary savings to provide treatment to offenders before, during, and after incarceration. *See Conaway v. State*, 464 Md. 505, 519 (2019).

an enterprise whose members:

(1) individually or collectively engage in a pattern of organized crime activity;

(2) have as one of their primary objectives or activities the commission of one or more underlying crimes, including acts by juveniles that would be underlying crimes if committed by adults; and

(3) have in common an overt or covert organizational or command structure.

**B**

Mr. Williams contends that CR § 9-805 is a specific intent offense aimed at gang "kingpins," and that "promote" therefore must be read to "require a specific *mens rea* that narrows the sweep of § 9-805 to those persons with direct or vicarious participant liability under § 9-804 as a leader[.]" He argues that a broader interpretation would render the statute unconstitutionally vague, depriving individuals of fair notice of what conduct is prohibited. Further, Mr. Williams claims that interpreting the statute to contain a specific intent requirement is necessary to avoid infringement of protected speech and association under the First Amendment. In particular, he argues that, without a specific intent requirement, § 9-805(a) would intrude upon protected speech and associational activities. *See, e.g.*, *Cruz-Quintanilla v. State*, 455 Md. 35, 48 (2017) (membership in the MS-13 gang is subject to First Amendment protection).

The State counters that CR § 9-805 was enacted to address the growing reach of criminal organizations, and that it applies broadly to individuals whose conduct furthers the organization's aims, regardless of formal rank or leadership role. In the State's view, "promote" includes actions that raise a gang's visibility, reputation, or influence –

10

including, for example, the graffiti in this case. The State also maintains that CR § 9-805 requires only general intent: the intent to engage in the proscribed conduct, with no requirement that the actor have a further criminal objective.

As we explain below, neither party's position fully captures the correct interpretation of CR § 9-805. *First*, we agree with the State that CR § 9-805 is a general intent crime and not a specific intent crime. But that conclusion does not open the door to the sort of sweeping liability that Mr. Williams warns against, including prosecutions of people who do not know that their acts are promoting a criminal organization. To obtain a conviction under CR § 9-805, the State must prove that the defendant knew the organization he or she was promoting was a "criminal organization" as defined in CR § 9-801(c). That, in turn, requires proof of the defendant's knowledge that: (1) the organization is an "enterprise," as further defined in CR § 9-805(d); (2) the members of the organization engage in a "pattern of organized crime activity," as further defined in CR § 9-801(e); (3) the members have as one of their primary objectives or activities the commission of one or more "underlying crimes," as that term is further defined in CR § 9-801(g); and (4) the members have in common an overt or covert organizational or command structure.

*Second*, we agree with Mr. Williams that the General Assembly did not intend "promote," as used in the statute, to sweep so broadly that it covers individuals who do not exercise a leadership role in a criminal organization or – if they are not members of the organization – do not exercise discretionary authority with respect to the act of promotion.

11

1. <u>Knowledge That the Organization Is a "Criminal Organization"</u>

Most criminal laws consist of two essential elements: a guilty act (*actus reus*) and a guilty mind (*mens rea*). *Garnett v. State*, 332 Md. 571, 577-78 (1993). The *actus reus* constitutes the physical action prohibited by the law. *Id.* The *mens rea* is the culpable mental state that the statute prohibits. *Id.*

In determining the scope of the *mens rea* element, if any, in CR § 9-805, we first look to the text of the statute. Section 9-805(a) provides that "[a] person may not organize, supervise, promote, sponsor, finance, or manage a criminal organization." This language is silent as to the mental state required for a violation. It says only that a person "may not" engage in any of the enumerated acts.

We have recognized that the absence of explicit *mens rea* language in a statute "does not unquestionably eliminate *mens rea* as an element of a criminal statute." *Lawrence*, 475 Md. at 409; *see also Elonis v. United States*, 575 U.S. 723, 734 (2015) ("The fact that [a] statute does not specify any required mental state ... does not mean that none exists.") (citation modified). The reason for that stems from the common law, which traditionally required that criminal liability be predicated on a "guilty mind." *Morissette v. United States*, 342 U.S. 246, 257 (1952); *accord Lawrence*, 475 Md. at 408 (noting the "longstanding presumption, traceable to the common law," that the legislature intends to require a culpable mental state) (citing *Rehaif v. United States*, 588 U.S. 225, 228-29 (2019)); *Garnett*, 332 Md. at 578 ("The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence.").

Although "the contemporary view ... disfavors strict liability offenses," *State v. McCallum*, 321 Md. 451, 456 (1991) (quoting *Dawkins v. State*, 313 Md. 638, 650 (1988)), this Court has acknowledged that the Legislature may enact strict liability statutes "as it sees fit to regulate the public welfare." *Lawrence*, 475 Md. at 412 (citation omitted). Even so, we have been "reluctant to read into criminal statutes an intent of the legislature to forego a mens rea requirement." *Lowery v. State*, 430 Md. 477, 499 (2013) (quoting *Owens v. State*, 352 Md. 663, 671 (1999)). "When we have read the absence of explicit *mens rea* language in a statute as an indication that the statute imposed strict liability or precluded a lack of knowledge defense, we have generally done so after finding … clear indications in either the larger statutory language or the legislative history of the law that the General Assembly intended that result." *Id.* A point we consider in determining whether to infer a *mens rea* requirement is the severity of the punishment provided by the statute. *See id.* at 501 ("Other things being equal, the greater the possible punishment, the more likely some fault is required; and conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.") (quoting WAYNE R. LAFAVE, CRIMINAL LAW 291 (5th ed. 2010)).[4]

---

[4] In *Lowery*, we held that a statutory penalty of up to one year in prison or a $2,000 fine for a second offense weighed against reading the statute to impose strict liability. 430 Md. at 502. This was in contrast to *State Central Collection Unit v. Jordan*, 405 Md. 420, 433 (2008), in which this Court held that the criminal law at issue – which did not carry potential incarceration but, rather, only a fine – was a strict liability offense. *See Lowery*, 430 Md. at 501-02 (contrasting *Jordan* with the case before the Court in *Lowery* and other cases in which incarceration was a potential sanction).

13

Here, neither Mr. Williams nor the State contends that CR § 9-805 establishes a strict liability offense. We agree that the General Assembly intended to incorporate a *mens rea* requirement in the statute, which provides for imprisonment of up to 20 years. The next question, then, is what mental state must the State prove to convict someone under CR § 9-805? We hold that § 9-805 requires proof that the defendant knew the organization they were organizing, supervising, promoting, sponsoring, financing, or managing was a "criminal organization," as that term is defined in CR § 9-801(c). This interpretation flows both from the statutory text and overall statutory scheme.

Each verb in CR § 9-805(a) – "organize," "supervise," "promote," "sponsor," "finance," and "manage" – connotes intentional and informed conduct. In *Lawrence*, we observed that the verbs "wear," "carry," and "transport" suggested "some level of knowledge or understanding" of the presence of a handgun, which was the *actus reus* at issue in that case. 475 Md. at 406.[5] The same logic applies here. It strains credulity to suggest that a person can "organize," "supervise," or "manage" a "criminal organization" without knowing that the organization is, in fact, criminal. These verbs naturally presuppose knowledge of the entity's nature.

_____

[5] Although we recognized in *Lawerence* that these verbs tended to suggest a knowledge requirement, "[r]elying on the doctrine of *stare decisis*," we held that the General Assembly intended CR § 4-203(a)(1)(i) to be a strict liability offense, and also observed that the text, structure, and legislative history of CR § 4-203(a)(1)(i) overcame the "longstanding presumption that criminal offenses contain *mens rea* as an element[.]" *Lawrence*, 475 Md. at 390; *see also Garnett*, 332 Md. at 585 (reasoning that the text, structure, and legislative history of Maryland's second-degree rape statute led to the conclusion that it was a strict liability offense).

The other verbs in § 9-805(a) – promote, finance, and sponsor – may or may not presuppose knowledge of the nature of the verb's object. That is because those who promote, finance, or sponsor an organization may not necessarily be members of the organization or even have any knowledge of the mission or operations of the organization. For example, consider an organization that, while once a legitimate charity, is now, unbeknownst to the general public, operating a large-scale identity fraud scheme and therefore qualifies as a "criminal organization." *See* CR § 9-801(g)(5) ("underlying crime" includes felony violation of Criminal Law Article, Title 8); *id.* § 8-301(g)(1) (classifying certain identity fraud crimes as felonies). The criminal organization decides to hold a supposed gala event, the actual purposes of which will be to obtain working capital for the organization as well as the credit card information of those who purchase tickets, which the organization will subsequently sell on the dark web.

The organization hires a social media influencer to promote its event. When the influencer creates and posts a video on TikTok to get word out about the event, they are "promoting" the organization without knowing the organization's criminal nature. A person who sees the video and decides to purchase a ticket is "financing" the organization without knowing what the organization actually is or does. And if that person buys 10 tickets to the event, they may be thanked in the program for "sponsoring" the event. The influencer and ticket buyer would know that they were promoting, financing, or sponsoring some kind of organization, but they would not know that the organization was a "criminal organization."

We do not believe the General Assembly intended to allow for the prosecution of those who promote, finance, or sponsor a criminal organization without knowing that the organization they are helping is actually a criminal organization. Given that the other verbs in CR § 9-805(a) presuppose knowledge of the nature of the organization, we conclude that the General Assembly intended the statute to cover only those who commit the prohibited acts knowing that the organization in question is a "criminal organization." In this regard, we rely on the canon of construction known as *noscitur a sociis*, which translates as "it is known from its associates." *McCree v. State*, 441 Md. 4, 12 (2014). Under this maxim, "the meaning of a word is known from the accompanying words so that general and specific words, capable of analogous meaning, when associated together, take color from each other, so that general words are restricted to a sense analogous to less general." *Id.* (citation modified).[6]

Recall that "criminal organization" is a defined term in Subtitle 8. Under CR § 9-801, a criminal organization is

an enterprise whose members:

(1) individually or collectively engage in a pattern of organized crime activity;

(2) have as one of their primary objectives or activities the commission of one or more underlying crimes, including acts by juveniles that would be underlying crimes if committed by adults; and

(3) have in common an overt or covert organizational or command structure.

---

[6] We discuss *noscitur a sociis* in greater detail below.

16

CR § 9-801(c). An "enterprise" is defined as "a sole proprietorship, partnership, corporation, business trust, or other legal entity; or … any group of individuals associated in fact although not a legal entity." *Id.* § 9-801(d). A "pattern of organized crime activity" is defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of two or more underlying crimes or acts by a juvenile that would be an underlying crime if committed by an adult, provided the crimes or acts were not part of the same incident." *Id.* § 9-801(e). And an "underlying crime" is defined in CR § 9-801(g) to include a host of specific crimes under Maryland law, as well as similar crimes under federal law or the law of another state. *See id.* § 9-801(g)(1) through (15).

These defined terms inform the scope of CR § 9-805's knowledge requirement. Thus, to prove that a defendant knew they were organizing, supervising, promoting, financing, sponsoring, or managing a "criminal organization," the State must introduce evidence from which the jury can find that the defendant knew that: (1) the organization was either a legal entity or a group of individuals associated in fact (an "enterprise"); (2) the members of the organization engage in a pattern of organized crime activity, *i.e.*, the commission of, attempted commission of, conspiracy to commit, or solicitation of two or more "underlying crimes" as that term is defined in CR § 9-801(g)); (3) the members of have as one of their primary objectives or activities the commission of one or more such underlying crimes; and (4) the members have in common an overt or covert organizational or command structure. The State may prove a defendant's knowledge that the organization in question is a "criminal organization" through direct and/or circumstantial evidence. *See, e.g.*, *O'Sullivan v. State*, 476 Md. 602, 636 (2021) (State may prove element of falsity in a

perjury case through direct evidence, circumstantial evidence, or both); *State v. Smith*, 374 Md. 527, 534 (2003) ("A valid conviction may be based solely on circumstantial evidence.").

    2. General Intent v. Specific Intent

Mr. Williams contends that CR § 9-805 goes beyond requiring knowledge of the criminal nature of the organization. He argues that the statute contains a specific intent element. According to Mr. Williams, the State must prove not only that the defendant knew they were organizing, supervising, promoting, sponsoring, financing, or managing a "criminal organization," but also that they did so with the intent to commit a particular "underlying crime." We disagree.

Maryland's criminal laws include both general intent and specific intent offenses. A general intent crime requires only that the defendant intended to perform the prohibited act. *Harris v. State*, 353 Md. 596, 604-05 (1999). We have explained that where the statutory crime simply describes a prohibited act – without requiring a further intent to bring about a particular consequence or to commit another act – "we ask whether the defendant intended to do the proscribed act." *Chow v. State*, 393 Md. 431, 465 (2006) (citation omitted). A specific intent crime, by contrast, requires not only intent to commit the act, but also the intent to achieve some further result, purpose, or goal. *See Shell v. State*, 307 Md. 46, 63-65 (1986); *see also id.* at 63 (explaining that a specific intent crime requires "the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result").

On its face, CR § 9-805(a) does not include a specific intent requirement; *i.e.*, it does not say that the defendant must organize, supervise, promote, sponsor, finance, or manage a criminal organization with the intent to accomplish any particular act. In contrast, another provision of Subtitle 8, CR § 9-802(a), states: "A person may not threaten an individual, or a friend or family member of an individual, with physical violence *with the intent* to coerce, induce, or solicit the individual to participate in or prevent the individual from leaving a criminal organization." (Emphasis added). By its plain terms, CR § 9-802(a) requires not only that the defendant threaten physical violence, but that they do so with the specific purpose of coercing the victim to join or remain in the organization. That kind of formulation is typical of specific intent crimes. *See, e.g.*, CR § 6-202(a) ("A person may not break and enter the dwelling of another *with the intent* to commit theft.") (emphasis added). Thus, "[i]t is evident that when the Legislature desires to create a specific intent crime, it knows how to do so." *Harris*, 353 Md. at 606-07 n.3.

Recognizing that nothing in the text of CR § 9-805 creates a specific intent requirement, Mr. Williams attempts to demonstrate that such a requirement is implicit in the statute through a series of propositions. His reasoning appears to be as follows: (1) CR § 9-805 is a gang kingpin statute; (2) it resembles CR § 5-613, which targets "drug kingpins" – defined as organizers, supervisors, financiers, or managers – who conspire to distribute drugs; (3) therefore, the General Assembly must have intended CR § 9-805 to apply only to those who occupy a heightened, more culpable role in a "criminal organization," which resembles a conspiracy; (4) individuals who organize, supervise, promote, sponsor, finance, or manage a criminal organization are more culpable than those

19

with mere participant liability under CR § 9-804; (5) accordingly, CR § 9-805 must be limited to those who could also be held liable under CR § 9-804, which prohibits knowingly and willfully directing or participating in an "underlying crime"; (6) therefore, CR § 9-805 must include a specific intent to further a statutory underlying crime; and (7) any other reading would render CR § 9-805 unconstitutional and other provisions in the statutory scheme superfluous.

Mr. Williams's argument injects unwarranted complexity into the statute. Moreover, his argument fails to recognize that, in enacting Subtitle 8, the General Assembly targeted criminal organizations, not just the specific criminal acts such criminal organizations commit. These are organizations that, in many respects, function as businesses. Operating a business that derives its revenue from selling widgets requires more than selling widgets. Among other things, it can require hiring the salespeople who will sell the widgets as well employees to handle back-office functions, supervising employees' work, obtaining lines of credit, developing marketing campaigns, and engaging in long-range strategic planning.

Similarly, running a criminal organization entails more than committing underlying crimes. Recruitment is a useful example. While recruitment of new gang members furthers the gang's criminal objectives, recruitment itself may not be tied to an underlying crime listed in CR § 9-801(g). Yet it can be a key act in the operation of a criminal organization, directed by leaders most invested in seeing the criminal enterprise grow. The General Assembly reasonably could have concluded that early intervention – before a gang targets vulnerable youths for membership and grows more dangerous – is essential.

Consider also someone who finances a gang with knowledge that it is a "criminal organization" but without being a member of the gang. Such a person might accept a proposal from the gang to fund its operations in exchange for a share of the profits, without knowing anything about the specific crimes the gang will commit with those funds. Indeed, one can imagine that if a member of the gang asked such a would-be financier if he wanted to know how the organization was going to use his funds, the financier might say he did not want to know. Section 9-805 allows authorities to target this person who is important to the organization and who benefits from its criminal activities without having any knowledge of, or role in, the particular underlying crimes the organization commits.[7]

The knowledge requirement discussed above is sufficient to prevent the prosecution of those who have no *mens rea*; for example, someone who promotes an organization

---

[7] At oral argument, Mr. Williams offered a slightly more streamlined argument regarding specific intent, contending that it derives from CR § 9-805(a)'s use of the term "criminal organization." Again, section 9-801(c) defines that term, in part, as an enterprise whose members engage in a pattern of criminal activity and have as one of their primary objectives the commission of "underlying crimes," as further defined in CR § 9-801(g). Because CR § 9-805(a) prohibits organizing, supervising, promoting, sponsoring, financing, or managing a "criminal organization," Mr. Williams argues that the statute necessarily incorporates a specific intent to further particular underlying crimes.

We are unpersuaded. Section 9-805 prohibits certain acts directed toward an entity that meets the statutory definition of a "criminal organization." Nothing in CR § 9-805 suggests that a defendant must commit those acts with the specific intent to further a particular "underlying crime." Moreover, there may well be leaders of criminal organizations who do not personally engage in the planning or carrying out of any particular underlying crimes, content to let their middle managers and those supervised by them handle such dirty work. Section 9-805 represents the legislative determination that those who are high up enough in a criminal organization to distance themselves from the planning and execution of underlying crimes should nevertheless be held accountable – indeed, that they should be subject to serious penalties for their leadership of the organization.

21

without knowing that it is a criminal organization. In light of our interpretation of "promote" discussed below, an additional specific intent element is not necessary to avoid sweeping in those who engage in First Amendment-protected activity.

In short, Mr. Williams's proposal to read a specific intent requirement into CR § 9-805 cannot be squared with the statute's text. Section 9-805(a) prohibits certain acts directed toward a criminal organization. That is a general intent crime. Nothing in the text compels a different conclusion, and the concerns raised by Mr. Williams do not justify rewriting the statute to impose an intent element the General Assembly chose not to include.

3. The Intended Targets of CR § 9-805

With the *mens rea* established, we turn now to Mr. Williams's argument that the General Assembly intended CR § 9-805 not to apply to low-level members of a criminal organization. We conclude that the General Assembly intended § 9-805 to reach only those who exercise a leadership role in a criminal organization or – if they are not members of a criminal organization – exercise discretionary authority in connection with the act covered by § 9-805(a).

a. *Plain Language of CR § 9-805(a)*

As always, we begin with the text. Mr. Williams was charged under the part of § 9-805(a) that makes it a crime to "promote" a criminal organization. In the absence of a statutory definition of "promote," we first consult dictionaries for the ordinary meaning of the term. Merriam-Webster defines "promote" as, among other things, "to contribute to the growth or prosperity of: FURTHER." *Promote*, Merriam-Webster, available at

22

https://perma.cc/FX35-4LTQ. The Oxford English Dictionary (3d ed. 2010) offers similar definitions, including: to "support or actively encourage (a cause, venture, etc.)" or to "give publicity to … so as to increase … public awareness." At first blush, applying the ordinary meaning of "promote," as set forth in these dictionary definitions, to CR § 9-805(a) seems sensible. After all, preventing the growth of criminal organizations is not an irrational legislative goal. Far from it.

However, upon further analysis, the ordinary meaning of "promote," as applied to all people whose conduct could be said to promote a criminal organization, seems too broad to be consistent with the General Assembly's intent. Consider a podcaster who does an episode about a gang – covering not only its criminal activity and interactions with law enforcement, but also its internal bonds and even some good works that it has done in the community over the years. Imagine, further, that a member of the gang subsequently tells police that they joined the gang after seeing a video of the podcast. A prosecutor reasonably could argue that the podcaster's reporting contributed to the growth of the gang and/or gave publicity to the gang so as to increase public awareness of it.

Reading CR § 9-805 to allow prosecution of the podcaster in this scenario would stretch the statute beyond its plausible reach and lead to an absurd result. It also would create substantial First Amendment problems. Thus, a limiting interpretation of "promote" that narrows its application from all possible promoters to a subset of potential promoters is necessary. *See Lockshin*, 412 Md. at 276 ("In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense."); *Koshko v. Haining*, 398 Md. 404, 425-26 (2007) (explaining that the doctrine of

23

"constitutional avoidance" provides that "a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible") (internal quotation marks and citations omitted).

In this regard, the principle of *noscitur a sociis* is instructive. As discussed above, this canon of statutory construction advises courts to interpret words grouped in a list as having related or similar meanings. *See McCree*, 441 Md. at 12; *see also Yates v. United States*, 574 U.S. 528, 543 (2015) (explaining that this principle "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to [statutes]") (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995)).

Here, the word "promote" appears in a statutory list that also includes the verbs "organize," "supervise," "sponsor," "finance," and "manage." Each of these other verbs conveys a level of control, authority, or discretion. To "organize" an enterprise implies strategic oversight; to "supervise" or "manage" implies authority over people and operations; to "sponsor" connotes backing; to "finance" implies a significant monetary contribution to the group's sustenance or expansion. All of these terms involve the exercise of discretion or decision-making authority consistent with leadership.

Interpreted in context, then, "promote" in CR § 9-805(a) can reasonably be read to connote discretion concerning how the organization will market itself – in the same way that Don King would be viewed as the person who "promoted" a boxing match, as opposed

24

to the employees of his company, let alone anyone who hung a poster advertising an upcoming match for which King was the promoter.[8]

The authorized penalties of CR § 9-805 also militate toward a reading that limits its application to those who exercise a leadership role or, if outside the criminal organization, discretionary authority regarding the act of promotion. Violation of CR § 9-805 carries up to 20 years' imprisonment and a $1,000,000 fine. CR § 9-805(b). In contrast, under CR § 9-802, a person who threatens an individual with physical violence with the intent to coerce the individual to participate in a criminal organization faces up to two years' imprisonment and a fine not exceeding $10,000. If such threatening conduct occurs in a school vehicle or within 1,000 feet of school property, the perpetrator may be sentenced to a maximum of four years' imprisonment and a fine of $20,000. *Id.* § 9-803. If a person participates in a criminal organization with knowledge that its members engage in a pattern of racketeering activity and directs or participates in an "underlying crime," they are subject to up to 15 years' imprisonment and a $1,000,000 fine. *Id.* § 9-804(f)(1)(i).[9] A broad reading of "promote" that exposes a low-level member of a gang to 20 years of imprisonment for following an order to stand guard while another gang member paints a

---

[8] For more on the career of Don King and his company, Don King Productions, see Chris Mannix, *Still as bombastic as ever, Don King now an afterthought in the ring*, SI.com (July 10, 2015), available at https://perma.cc/W9Z2-NHDQ.

[9] The only penalty provision in Subtitle 8 that is more severe than § 9-805(b) is CR § 9-804(f)(1)(ii), which applies when a person is killed during the commission of an underlying crime. That offense carries a maximum penalty of 25 years' incarceration and a $5,000,000 fine.

pro-gang message on a wall would arguably be inconsistent with the overall penalty scheme contained in Subtitle 8.

But while this contextual reading of "promote" is reasonable, it is not the only reasonable limiting construction of the term. Unlike an interpretation that is broad enough to apply to journalists and others outside a criminal organization whose actions may incidentally promote an organization, construing "promote" to apply to all members of a criminal organization would not be absurd. On this reading, the General Assembly could have intended to provide sentencing courts with the flexibility to sentence high-level promoters to longer prison sentences, while (as in this case) imposing less severe sentences on lower-level individuals.

In sum, although "promote" seems to be unambiguous when viewed in isolation, it becomes ambiguous when read in the larger statutory scheme. And while we perceive the need to limit the application of "promote" in CR § 9-805(a) to a subset of potential promoters, the statutory scheme suggests more than one possible reasonable limiting construction. To resolve this ambiguity, we turn to legislative history. *See Bennett*, 485 Md. at 486.

### b. *Legislative History*

As discussed at the outset of this opinion, the General Assembly added CR § 9-805 to Subtitle 8 in 2010, and added "promote" and "sponsor" to § 9-805(a)'s list of prohibited acts in 2016. We discuss the legislative history that bears on these enactments.

**2010.** In 2010, the Department of Legislative Services ("DLS") wrote that "[t]he proliferation of gangs and their migration from urban communities to suburban and rural

26

locations, … is a significant problem in most areas of the country, including Maryland." Dep't of Leg. Servs., Fiscal and Policy Note, H.B. 756 (2010 Sess.) at 4. DLS reported that it was "estimated that there are over 600 active gangs in the State with over 11,000 members." *Id.*

The General Assembly reacted to these and related developments by significantly amending Subtitle 8 in the Maryland Gang Prosecution Act of 2010. This law emerged from cross-filed bills (H.B. 756 and S.B. 517). *See* 2010 Md. Laws 1459 (ch. 197). Section 9-805 was added during the amendment process in response to concerns that the bill targeted low-level actors while failing to reach gang leaders. Both the ACLU of Maryland and the Office of the Public Defender ("OPD") submitted position letters[10] opposing the bill on this ground. The ACLU urged a focus on "dangerous gang criminals" who "*direct criminal activity[.]*" *See* ACLU of Md., Testimony for the Senate Judicial Proc. Comm. at 1, 2010 Reg. Sess. (Mar. 18, 2010) (bill file) (emphasis added). OPD was more explicit: "The purpose of the gang legislation is to target *kingpins* and *gang leaders*. SB 517 casts a broad net to include lowly players who commit petty, non-violent crimes for individual gain." *See* OPD, Position on Proposed Legislation at 2, 2010 Reg. Sess. (Mar. 18, 2010) (bill file) (emphasis added).

---

[10] Courts do not treat position statements submitted by state agencies and interest groups as "infallible guides to the intent of the Legislature." *Hayden v. Maryland Dep't of Nat. Res.,* 242 Md. App. 505, 532 (2019). Still, we have recognized that such statements in some instances "can be useful in identifying the problem confronting the Legislature." *Buarque de Macedo v. Auto. Ins. Co. of Hartford, Conn.*, 480 Md. 200, 227 n.5 (2022) (internal quotation marks and citations omitted).

On April 6, 2010, Senator Robert Zirkin introduced a floor amendment that included the provision that became CR § 9-805. *See* Amend. No. SB0517/733022/3, 2010 Reg., 427th Sess. (Apr. 6, 2010). A supporting document in the Senate and House bill files, titled "HB 756 As Amended Responds to ACLU and OPD & Others," stated: "**Gang Kingpins** – *Targeting those at the top of the Criminal Gang*[:] Added specifically to respond to concerns over many years and by committee members to target those at the top. Those who organize, manage, finance, and supervise gang activity."

Other legislative material reinforces this purpose. The Floor Report for H.B. 756 summarized the bill as adding a "PROHIBITION AGAINST BEING A GANG KINGPIN." Floor Report, H.B. 756 (2010 Sess.) (Short Summary). In addition, it explained that "[u]nder the gang kingpin offense created by the bill, a person is prohibited from organizing, supervising, financing, or managing a criminal gang." *Id.* (Summary of Bill). It also referred to the "creation of a gang kingpin offense" and to "monetary penalties for gang kingpin violations[.]" *Id.* **(**Fiscal Impact). Likewise, the Revised Fiscal and Policy Note for H.B. 756 referred to CR § 9-805 as a "gang kingpin" offense multiple times. The Revised Fiscal and Policy Note for S.B. 517 contained the same references. And, on the Senate floor, Senator Zirkin stated that the bill "very importantly … comes up with a new statute – a new crime – for what is a gang kingpin, for lack of a better term." S. Floor Action, 2010 Reg., 427th Sess. (Apr. 10, 2010), at 54:25, available at https://mgahouse.maryland.gov/mga/play/ec1ab767-5c47-48b5-b6c0-7e8b1c65530a?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c; also available at https://perma.cc/A8DJ-3DQH.

Notably, the operative words of Senator Zirkin's amendment – "organize, supervise, finance, or manage" – are verb forms of the nouns that were contained in the definition of "drug kingpin" in the pre-existing "Drug kingpin" statute, CR § 5-613: "organizer, supervisor, financier, or manager[.]" CR § 5-613 (2002).[11] We also note that, among the documents contained in the bill file for H.B. 756, is a photocopy of two pages of the Annotated Code of Maryland relating to the Drug kingpin statute, including the text of that statute.

This legislative history provides convincing evidence that, when the General Assembly added CR § 9-805 to Subtitle 8, it intended to reach those individuals who were leaders in criminal gangs or who exercised discretionary authority with respect to the alleged prohibited act if not a gang member. There is no basis to believe that the General Assembly intended the 2010 version of § 9-805 to have any application to an individual

---

[11] At the time of enactment of CR § 9-805, the "Drug kingpin" statute provided, in pertinent part:

(a) *"Drug kingpin" defined.* – In this section, "drug kingpin" means an organizer, supervisor, financier, or manager who acts as a coconspirator in a conspiracy to manufacture, distribute, dispense, transport in, or bring into the State a controlled dangerous substance.

(b) *Drug kingpin conspiracy; penalty.* – (1) A drug kingpin who conspires to manufacture, distribute, dispense, transport in, or bring into the State a controlled dangerous substance in an amount listed in § 5-612 of this subtitle is guilty of a felony and on conviction is subject to imprisonment for not less than 20 years and not exceeding 40 years without the possibility of parole or a fine not exceeding $1,000,000 or both.

CR § 5-613 (2002).

who neither exercised a leadership role in a gang nor exercised discretionary authority with respect to the prohibited act if not a gang member.[12]

**2016.** Gang activities continued to grow in Maryland in the 2010s. *See* Fiscal and Policy Note, H.B. 461 and S.B. 388 (2016 Sess.) ("According to the *2013 Maryland Gang Threat Assessment* by the Maryland Coordination and Analysis Center within the Governor's Office of Crime Control and Prevention, Maryland communities are experiencing an overall increase in the presence of gangs, gang members, and gang activities."). So in 2016, as part of the Justice Reinvestment Act, the General Assembly revised § 9-805(a) to add "promote" and "sponsor" to the list of prohibited acts and raised the maximum fine from $100,000 to $1,000,000. *See* 2016 Md. Laws 6404 (ch. 515). These terms were not part of the bill as introduced; the House Judiciary Committee added them by amendment to S.B. 1005 (cross-filed with H.B. 1312), and the Conference Committee

---

[12] Disagreeing with this conclusion, the State notes that when the General Assembly intended to target "drug kingpin" activity, it did so explicitly, defining those who organize, supervise, finance, and manage controlled dangerous substance conspiracies as "drug kingpin[s]." From this, the State argues that because the General Assembly did not use the word "kingpin" in CR § 9-805, it must not have intended to create a kingpin statute. We find the absence of the word "kingpin" from CR § 9-805 insignificant. More important is the fact that, in denoting the prohibited acts under § 9-805, the General Assembly used the verb forms of the four nouns contained in the definition of a "drug kingpin." By that time, it was well settled that the drug kingpin statute provides for heightened punishment of "those who occupy positions of importance in drug conspiracies[.]" *Williams v. State*, 329 Md. 1, 11 (1992). We presume that the General Assembly was aware of our interpretation of the drug kingpin statute at the time it enacted CR § 9-805, *see, e.g.*, *Taylor v. Mandel*, 402 Md. 109, 131 (2007) (noting that courts "presume that the Legislature has acted with full knowledge of prior and existing law, legislation and policy"), and that this sheds light on its intent in modeling § 9-805 after the drug kingpin statute.

later adopted the change. *See* S.B. 1005, Conf. Comm. Amend. No. 133825/1, at 107, 2016 Reg., 436th Sess.

The parties agree, as do we, that the available legislative history for the Justice Reinvestment Act does not shed any light on why "promote" and "sponsor" were added to CR § 9-805(a). Still, in our effort to understand the General Assembly's intent, we may consider indicia elsewhere in the broader legislative context. *See, e.g.*, *Moore*, 476 Md. at 514, 527-28 (examining the legislative history of a prior, unsuccessful bill – containing key reports revealing legislative intent – to interpret the law enacted in the following session).

To that end, after oral argument, we granted the State's unopposed motion to provide supplemental briefing regarding H.B. 461 and S.B. 388 (2016 Sess.), which had been introduced earlier in the 2016 legislative session. These cross-filed bills sought to implement recommendations made by Governor Hogan's Heroin and Opioid Emergency Task Force (the "Task Force").[13] *See* Fiscal and Policy Note, H.B. 461 and S.B. 388 (2016 Sess.) (both describing the Task Force's Final Report as the impetus for the legislation). The Task Force recommended that Maryland adopt a RICO-style statute targeting the leadership of criminal organizations. *See* Heroin & Opioid Emergency Task Force, Final Report 16-17 (Dec. 1, 2015). The Task Force explained that, under existing law, "*leaders that are still in place can recruit replacements and keep the organization running.*" *Id.* at 17 (emphasis added).

---

[13] Governor Hogan formed the Heroin and Opioid Emergency Task Force in February 2015 via Executive Order 01.01.2015.12. *See* Governor's Heroin & Opioid Emergency Task Force, *Maryland Manual Online*, Maryland State Archives, available at https://perma.cc/552Z-VQUE.

H.B. 461 and S.B. 388 proposed adding "promote" and "sponsor" to CR § 9-805. The Fiscal and Policy Notes for the bills described CR § 9-805 as addressing "Criminal Gang (Managerial/Upper Level Activities)," both in explaining the amendment and in summarizing current law:

**Bill Summary:**

….

*Criminal Gang (Managerial/Upper Level Activities), § 9-805 of the Criminal Law Article:* The bill expands this offense by adding promoting or sponsoring a gang to the list of prohibited activities. The bill also increases the maximum fine for this offense from $100,000 to $1.0 million.

….

**Current Law:**

….

*Criminal Gang (Managerial/Upper Level Activities), § 9-805 of the Criminal Law Article:* A person is prohibited from organizing, supervising, financing, or managing a criminal gang. A violator is guilty of a felony, punishable by imprisonment for up to 20 years and/or a $100,000 maximum fine. A sentence imposed for this offense must be separate from and consecutive to a sentence for any crime based on the act establishing a violation of this prohibition.

Fiscal and Policy Note, H.B. 461 (2016 Sess.), at 3-6; Fiscal and Policy Note, S.B. 388 (2016 Sess.), at 2-6. This suggests that the purpose of the amendments was to add to the kinds of acts that would trigger application of the statute without altering its focus on gang leadership.

Committee hearings on H.B. 461 support this understanding. A representative from the Governor's Legislative Office described the bill as a response to the Task Force's

Report and as partially modeled on RICO. *Hearing on H.B. 461 Before the H. Judiciary Comm.*, 2016 Reg., 436th Sess. (Feb. 16, 2016), at 1:36:36–1:38:00, 1:52:50–1:54:06, available at https://perma.cc/EW6K-H6KX; https://mgahouse.maryland.gov/mga/play/e44f2c831e7c4b6ba3b873fd062ebf0c1d?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=5760000.

During the hearing, several legislators expressed concern that the term "promote" might be read too broadly. Delegate David Moon questioned whether "promote" might unintentionally sweep in low-level offenders and asked for clarification. *Id.* at 1:47:30–1:48:15. Wesley Adams, then the State's Attorney for Anne Arundel County and testifying in support of H.B. 461, responded that the purpose of the amendment was to "curtail the proliferation of the gang" by prosecuting individuals responsible for recruiting. *Id.* at 1:48:15–1:48:54. Delegate Moon later noted that, unlike the other verbs in CR § 9-805(a), "promote" might not inherently connote leadership. *Id.* at 1:59:55–2:00:57. In response to a suggestion that "promote" could be replaced with "recruit," Delegate Moon stated that "it's really about limiting this to folks that are truly involved in management." *Id.* at 2:00:57–2:01:12.

Then-Delegate Kathleen Dumais echoed the concern, emphasizing the need to distinguish between gang participants and leaders. *Id.* at 2:16:29–2:17:21. Then-Delegate and Assistant State's Attorney Brett R. Wilson, another panelist, acknowledged that there is a role for prosecutors to exercise discretion in enforcing the criminal organization laws, but averred that the intent of the amendment was to reach "the big fish" – those managing operations and profiting from the gang's activities. *Id.* at 2:17:21–2:18:40. Delegate Wilson

33

added that "we can now reach out and touch that person also and that's really what the intent is." *Id.* at 2:18:01–2:18:09. He also testified that promotion in a gang context differs from its general meaning, often involving coercion, threats, and similar recruitment tactics designed to grow the gang. *Id.* at 2:12:36–2:13:20.

The Senate Committee hearing was similar. *See Hearing on S.B. 388 Before the Sen. Judicial Proc. Comm.*, 2016 Reg., 436th Sess. (Feb. 17, 2016), available at https://perma.cc/99TP-4EMX; https://mgahouse.maryland.gov/mga/play/e3930ac9efcf4c b4844081cb5806115d1d?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c.

A representative from the Governor's Legislative Office reiterated that S.B. 388, the cross-filed counterpart to H.B. 461, was modeled on RICO and stemmed directly from the Task Force's recommendations. *Id.* at 1:32:30–1:34:12. In his opening remarks, he stated: "I want to emphasize we want to go after the drug kingpin. That's who we're looking for. We're not looking for the low-level dealer. We're looking for the drug kingpin who's reaping in mass benefits from drug dealing." *Id.* at 1:33:50–1:34:03. Later, in response to a Committee member's question about the purpose of adding the terms "promote" and "sponsor," State's Attorney Adams explained: "The intent behind 'promote' or 'sponsor' would be to limit recruiting." *Id.* at 1:54:28–1:54:50.

The House Judiciary Committee issued an unfavorable report on H.B. 461 on March 31, 2016. *See* Gen. Assemb., H.B. 461, 2016 Reg. Sess., available at https://perma.cc/94ED-R64B. However, the substance of the bill had already been incorporated into the same Committee's second reading of S.B. 1005 (the Senate bill for the Justice Reinvestment Act) the previous day, by way of Amendment No. S.B.

34

1005/152714/1. *See* Gen Assemb., S.B. 1005, 2016 Reg. Sess., available at https://perma.cc/SQ4R-483U; Amend. No. S.B. 1005/152714/1, 2016 Reg., 436th Sess., available at https://perma.cc/FMT3-B5ML (adding "promote" and "sponsor" to CR § 9-805(a)). The same language also appeared in H.B. 1312, as amended by Amend. No. H.B. 1312/622316/1. *See* H.B. 1312/622316/1, 2016 Reg., 436th Sess., available at https://perma.cc/2RGJ-C4Q5.

According to Mr. Williams, the history of the unenacted H.B. 461 and S.B. 388 confirms his reading of what was added to CR § 9-805(a) in the Justice Reinvestment Act. He notes that, when questioned about the apparent breadth of "promote" and "sponsor," the witnesses who testified in favor of the bills advanced a narrower view of these terms, limiting criminal liability to upper-level actors who lead recruitment efforts. According to Mr. Williams, nothing in this history provides any reason to believe that the Legislature "added the words 'promote' and 'sponsor' to drastically alter the meaning of § 9-805 as a kingpin offense." In addition, Mr. Williams argues, the fact that the 2016 bill added "promote" with "sponsor" is significant because "sponsor" "corresponds to the authoritative or foundational conduct initially prohibited by the statute, that of a kingpin."

The State draws a different conclusion from the Committee hearings on H.B. 461 and S.B. 388. According to the State, the exchanges discussed above reflect legislators' awareness that the ordinary meaning of "promote" can apply to actions taken not only by leaders in an organization. The State argues that, armed with this knowledge, the General Assembly's decision not to amend the language further before enacting the same language

35

as part of the Justice Reinvestment Act effectively signaled its acceptance of the broader interpretation the State now advances.

The State's argument has some force. However, we are reluctant to conclude from the comments of a few legislators expressing concern about the breadth of "promote" that the General Assembly as a whole believed that this term would bring low-level gang members within the ambit of a statute that was modeled after the drug kingpin statute and thus targeted gang leaders and others who exercised discretionary authority consistent with leadership. This is especially the case, given that the Fiscal and Policy Notes for the unenacted bills described § 9-805 as directed toward "*Criminal Gang (Managerial/Upper Level Activities)*" and advised that the bills would have "expand[ed] *this offense* by adding promoting and sponsoring a gang to the list of prohibited activities." (Second emphasis added).

In sum, the legislative history of the original enactment of § 9-805 confirms that this statute was intended to reach gang leaders and others who exercise discretionary authority. Nothing in the legislative history of the Justice Reinvestment Act or the unenacted bills that contained the language that ultimately was added to CR § 9-805 convinces us that the General Assembly decided to change the nature of the statute in the way the State suggests.

### c. The Absurd Consequences of an Alternate Interpretation

Finally, we observe that the State's reading of CR § 9-805 not only could create substantial constitutional problems,[14] but could also incentivize prosecutors to charge

---

[14] As discussed above, Mr. Williams argues that a narrow interpretation of CR § 9-805 is necessary to avoid infringing protected speech and association under the First

36

promotion under CR § 9-805 in virtually all cases involving organized criminal activity. This would lead in some cases to absurd results. Consider, for example, a low-level gang member who, following orders of his superiors, recruits his younger sibling to join the gang without threatening physical violence. Under the State's interpretation of § 9-805, that gang member could be convicted of the felony offense of promoting a criminal organization and face a 20-year penalty under § 9-805(b), but could *not* be prosecuted under the two-year misdemeanor recruitment offense in CR § 9-802 (which requires proof that the defendant threatened physical violence to coerce, induce, or solicit an individual to participate in or prevent the person from leaving a criminal organization). We do not believe the General Assembly intended that outcome and other similar prosecutions to be a possibility.

*** 

For the reasons stated above, we conclude that the General Assembly intended CR § 9-805 to function effectively as a "kingpin" statute. That is, it is designed to reach acts committed by those who exercise a leadership role within a criminal organization or who

---

Amendment. There is no dispute that the form of speech at issue in this case – vandalism – is a criminal act and therefore not protected under the First Amendment. Perhaps for this reason, Mr. Williams's primary contentions in this appeal are not based on the First Amendment. As discussed, CR § 9-805 reaches only those who exercise leadership roles in criminal organizations or (if not members of criminal organizations) exercise discretionary authority consistent with leadership with respect to the prohibited act. Our resolution of this case leaves open the door to an as-applied First Amendment challenge to CR § 9-805 where the State prosecutes an alleged leader of a criminal organization for what the defendant claims is constitutionally protected speech.

– if they are not members of the organization – exercise discretion consistent with leadership with respect to the prohibited act.

## C

We turn now to the sufficiency of the evidence in this case. In light of the above analysis, the State was required to prove, among other things, that: (1) Mr. Williams knew the Rollin 30s Crips was a "criminal organization" as that term is defined in CR § 9-801(c); and (2) Mr. Williams exercised a leadership role in the Rollin 30s Crips or – if he was not a member of the gang at the time of the offense – that he exercised discretionary authority with respect to the act of promotion. We need not examine whether the stipulated facts were sufficient to prove that Mr. Williams knew the Rollin 30s Crips was a "criminal organization." Regardless of his knowledge, it is clear that the State did not introduce evidence that Mr. Williams exercised a leadership role within the Rollin 30s Crips or, if he was no longer a member of the gang at the time of the offense,[15] that he exercised discretionary authority with respect to the defacement of the wall at Veteran's Plaza. The extent of the State's evidence was that Mr. Williams stood watch while Mr. Dowdy – the "leader of their individual set" of the Crips – spray-painted the gang-related message on the wall, after which Mr. Williams posed for photographs. There is no indication that Mr.

---

[15] According to the stipulated facts, when Mr. Williams was taken into custody, "he admitted previous membership in the [C]rips." Confessing to "previous" membership could suggest that Mr. Williams was no longer in the gang at the time of the alleged offense. However, it may also mean he left the gang sometime after the incident but before making his statement to police. At sentencing, defense counsel appeared to suggest that Mr. Williams "ceased all ties with gang members" following the graffiti incident. Whether or not Mr. Williams was still a gang member at the time of the defacement of Veteran's Plaza does not affect the outcome here.

Williams ever occupied any leadership role in the Rollin 30s Crips. Nor is there any evidence that Mr. Williams directed, planned, or otherwise exercised discretion in connection with the offense. Accordingly, the circuit court erred in finding Mr. Williams guilty of violating CR § 9-805.

## V

For the reasons discussed above, we hold that the evidence was insufficient to convict Mr. Williams under CR § 9-805. Accordingly, we reverse the judgment of the Appellate Court and direct that the case be remanded to the Circuit Court for Montgomery County for the entry of a judgment of acquittal on Count One of the Indictment.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED AND CASE REMANDED TO THAT COURT WITH THE INSTRUCTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH THE INSTRUCTION TO VACATE THE JUDGMENT OF CONVICTION ON COUNT ONE OF THE INDICTMENT AND TO ENTER A JUDGMENT OF ACQUITTAL ON THAT COUNT; COSTS IN THIS COURT AND IN THE APPELLATE COURT OF MARYLAND TO BE PAID BY MONTGOMERY COUNTY.**

Circuit Court for Montgomery County
Case No.: C-15-CR-22-000553
Argued: June 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 44

September Term, 2024

---

JAMAL ANTOINE WILLIAMS

v.

STATE OF MARYLAND

---

Fader, C.J.,
Booth,
Biran,
Gould,
Eaves,
Killough,
Getty, Joseph M.
  (Senior Justice, Specially Assigned),

JJ.

---

Dissenting Opinion by Gould, J.,
which Getty, J. joins.

---

Filed: July 30, 2025

I respectfully dissent. The majority's interpretation of section 9-805 of the Criminal Law Article departs from established interpretive principles in two critical respects. *See* MD. CODE ANN., CRIM. LAW ("CR") § 9-805 (2021 Repl. Vol.). *First*, it imposes a knowledge requirement found nowhere in the statutory text, contradicting the General Assembly's deliberate choice to include such requirements in neighboring provisions while omitting them here. *See id. Second*, it eviscerates the plain meaning of the word "promote" through a limited construction that finds no basis in the statutory language, context, or legislative purpose. *See id.* For these reasons, I would affirm the conviction.

**I**

The two mens rea issues addressed by the majority are: (1) whether section 9-805 is a strict liability offense; and (2) whether section 9-805 has a knowledge requirement. The majority determines that section 9-805 is a general intent crime, but then disregards the force of its reasoning by imposing a knowledge requirement where none exists in the statute's text.

The majority correctly concludes that section 9-805 is not a strict liability offense, but rather requires proof of general intent—the intent to engage in the proscribed conduct, such as promoting, organizing, or financing a criminal organization. *See Harris v. State*, 353 Md. 596, 604 (1999). The majority bases this conclusion on its observation that the General Assembly expressly imposed a specific intent requirement in a close neighbor of section 9-805, section 9-802—which prohibits a person from threatening another individual "with physical violence with the intent to coerce, induce, or solicit the individual to participate in or prevent the individual from leaving a criminal organization." CR § 9-

802(a). From this, the majority concludes that the General Assembly knows how to impose a specific intent requirement when it wants to. Maj. Op. at 19. I fully agree with the majority's reasoning.

But the majority disregards this principle when it engrafts a knowledge requirement onto section 9-805. *See id.* at 11. In fact, the majority holds that the State must prove four layers of knowledge, namely:

> that the defendant knew that: (1) the organization was either a legal entity or a group of individuals associated in fact (an "enterprise"); (2) the members of the organization engage in a pattern of organized crime activity, *i.e.*, the commission of, attempted commission of, conspiracy to commit, or solicitation of two or more "underlying crimes" as that term is defined in CR § 9-801(g)[]; (3) the members . . . have as one of their primary objectives or activities the commission of one or more such underlying crimes; and (4) the members have in common an overt or covert organizational or command structure.

*Id.* at 17. But section 9-805 contains no such requirements. Not even a hint.

As with a specific intent requirement, the General Assembly knows how to impose a "knowledge" requirement when it wants to. For example, section 9-805's immediate neighbor, section 9-804, requires that, to be liable, a defendant must act "knowing that the members of the criminal organization engage in a pattern of organized crime activity[.]" CR § 9-804(a)(1). Other examples include CR § 3-214(a)-(b), prohibiting the "knowing[] and willful[] contaminat[ion]" of a water or food source; CR § 8-205(b)(3)(i), prohibiting the possession of a counterfeit credit card with the "intent to defraud" and "knowledge that [the card] was falsely made"; and CR § 11-202(a)(1)-(2), prohibiting "knowingly" sending or bringing "obscene matter into the State for sale or distribution[.]"

These examples stand in stark contrast to section 9-805, which contains no text that suggests *any* knowledge requirement, let alone the multi-layered one that the majority has imposed today. The closest the majority comes to finding textual support for this requirement is its observation that the prohibited activities in subsection 9-805(a)— "organize, supervise, promote, sponsor, finance, or manage a criminal organization[]"— "connote[] intentional and informed conduct." Maj. Op. at 14. To lend weight to that observation, the majority draws support from *Lawrence v. State*, where this Court similarly observed that the verbs used in CR § 4-203(a)(1)(i)—"wear, carry, or transport"—indicate a measure of awareness or understanding of the presence of a handgun. 475 Md. 384, 406 (2021).

But that semantic similarity goes only so far. As the majority acknowledges, *see* Maj. Op. at 14 n.5, we declined in *Lawrence* to impose a knowledge requirement in the absence of specific language mandating it, precisely because the General Assembly *expressly* imposed a knowledge requirement in the very next subsection, CR § 4-203(a)(1)(ii). As we explained:

> We agree to some extent that these verbs indicate some level of knowledge or understanding of the presence of the handgun, *i.e.* someone does not ordinarily "wear, carry, or transport" a handgun with no knowledge that they are doing so. Significantly, however, this argument improperly renders the word "knowledge" in subparagraph (a)(1)(ii) surplusage. "It is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things." While this rule is not "immutable," we find it instructive in discerning whether the General Assembly intended to include "knowledge" as an element of subparagraph (a)(1)(i) without expressly stating so. In choosing to exclude "knowingly" from subparagraph (a)(1)(i) but include it as an element of subparagraph

3

(a)(1)(ii), we presume that the General Assembly "meant what it said and said what it meant."

*Lawrence*, 475 Md. at 406 (citations omitted).

The majority's reliance on *Lawrence*, therefore, misses its point: Whether the verbs used in the statute indicate or imply some measure of knowledge or awareness is far less important than the fact that within the same statutory scheme, the General Assembly imposed a knowledge requirement in some provisions and left out a knowledge requirement in others.

We made that same point in *Garnett v. State*, a case that addressed the mens rea requirement for statutory rape. 332 Md. 571 (1993). There, we resisted the temptation to set aside the General Assembly's intent, despite obvious sympathy for the defendant, who was, in words typical of the 1990s, a 20-year-old "retarded man" with an IQ of 52. *Id.* at 574, 584-87. We explained:

> Section 463(a)(3) prohibiting sexual intercourse with underage persons makes no reference to the actor's knowledge, belief, or other state of mind. As we see it, this silence as to *mens rea* results from legislative design. First, subsection (a)(3) stands in stark contrast to the provision immediately before it, subsection (a)(2) prohibiting vaginal intercourse with incapacitated or helpless persons. In subsection (a)(2), the Legislature expressly provided as an element of the offense that "the person performing the act *knows or should reasonably know* the other person is mentally defective, mentally incapacitated, or physically helpless." In drafting this subsection, the Legislature showed itself perfectly capable of recognizing and allowing for a defense that obviates criminal intent; if the defendant objectively did not understand that the sex partner was impaired, there is no crime. That it chose not to include similar language in subsection (a)(3) indicates that the Legislature aimed to make statutory rape with underage persons a more severe prohibition based on strict criminal liability.

*Id.* at 585-86 (citations omitted).

4

The majority offers no reason why the principle that animated the Court's decisions in *Lawrence* and *Garnett*—the same one that the majority relied on in rejecting Mr. Williams's argument that section 9-805 requires specific intent—should not likewise counsel against grafting a knowledge requirement onto section 9-805.

**II**

**A**

The majority holds that the word "promote," as used in section 9-805 was "designed to reach acts committed by those who exercise a leadership role within a criminal organization or who – if they are not members of the organization – exercise discretion consistent with leadership with respect to the prohibited act." Maj. Op. at 37-38.

The majority begins by acknowledging the primacy of statutory text and consulting dictionary definitions of "promote." The majority notes that Merriam-Webster defines "promote" as "to contribute to the growth or prosperity of: FURTHER[,]" while the Oxford English Dictionary defines it as to "support or actively encourage (a cause, venture, etc.)" or to "give publicity to . . . so as to increase . . . public awareness." Maj. Op. at 22-23 (second and third alterations in original).

The majority does not contend that these definitions are ambiguous. To the contrary, the majority acknowledges that "applying the ordinary meaning of 'promote,' as set forth in these dictionary definitions, to CR § 9-805(a) seems sensible. After all, preventing the growth of criminal organizations is not an irrational legislative goal. Far from it." Maj. Op. at 23.

5

"When the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent." *75-80 Props., L.L.C. v. Rale, Inc.*, 470 Md. 598, 623 (2020) (quoting *Walzer v. Osborne*, 395 Md. 563, 572 (2006)). The majority's own words demonstrate that "promote" has a clear, unambiguous meaning that aligns with the Legislature's stated objective of combating criminal organizations. That should have ended its analysis.

But the majority declares that the plain meaning "seems too broad to be consistent with the General Assembly's intent." Maj. Op. at 23. The majority did not pause to identify any ambiguity in the statute to justify its departure from the statute's text. Instead, the majority conjures up a hypothetical podcaster "who does an episode about a gang – covering not only its criminal activity and interactions with law enforcement, but also its internal bonds and even some good works that it has done in the community over the years." *Id.* The majority concludes that the General Assembly could not have intended for "promote" to reach such conduct.

This reasoning is flawed. For starters, the majority neglects to explain how the application of the dictionary definitions of "promote" would create the risk that the statute would reach the hypothetical podcaster. And the majority ignores the general intent requirement that it had identified. Under the Merriam-Webster definition, section 9-805 makes it a crime to *intentionally* "contribute to the growth or prosperity of[]" a criminal organization. *Promote*, *Merriam-Webster Dictionary* (2016). While a podcaster engaging in journalism lacks the requisite intent to promote a criminal organization's growth, the same cannot be said of the conduct for which Mr. Williams was convicted. Thus, the plain

6

meaning of "promote," combined with the general intent requirement, adequately distinguishes between protected journalism and criminal conduct, without any need for judicial surgery.

Even if the podcaster hypothetical raised genuine constitutional concerns, under the principle of constitutional avoidance, this Court should use a scalpel, not an axe, to limit the reach of the statute.[1] Invoking the doctrine of *noscitur a sociis*, the majority chooses the latter, thereby transforming "promote" from a term covering anyone who intentionally advances a criminal organization into one limited to those with discretionary authority.

Invoking *noscitur a sociis* is neither justified nor necessary. As we explained in *Chow v. State*, an ambiguity arises only when there are "two or more reasonable alternative interpretations of the statute." 393 Md. 431, 444 (2006) (quoting *Price v. State*, 378 Md. 378, 387 (2003)). Here, the majority identifies no such competing interpretations of "promote." In any event, if constitutional concerns truly existed, they could be addressed through far more modest means, by: (1) applying the Merriam-Webster definition, which focuses on intentional contribution to growth rather than mere publicity; or (2) limiting the statute's reach to organization members, as the State suggests. Either solution would

---

[1] *See Koshko v. Haining*, 398 Md. 404, 427 (2007) (explaining that this Court "has applied limiting constructions to enactments that would otherwise sweep too broadly"); *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (explaining that a limiting construction in the First Amendment context narrows a problematic statute "as to remove the seeming threat or deterrence to constitutionally protected expression"); *Galloway v. State*, 365 Md. 599, 631 (2001) (reading a reasonable person standard into a harassment statute to carve out protected speech from the statute's reach); *Schochet v. State*, 320 Md. 714, 717, 730 (1990) (interpreting a statute criminalizing "unnatural or perverted sexual practices" to not encompass "consensual, noncommercial, heterosexual activity between adults" in their homes so as to avoid constitutional issues).

address any hypothetical podcaster problem without eviscerating the plain meaning of "promote."

The majority's analysis also reflects a novel expansion of *noscitur a sociis*. In *McCree v. State*, we used this doctrine to resolve a genuine ambiguity. 441 Md. 4, 12 (2014). There, the words "display" and "distribute," when viewed in isolation, could have swept too broadly to encompass constitutionally protected speech. *Id.* at 12-13. But by interpreting them alongside six other terms that "directly relate[d] to commercial acts or purposes[,]" we narrowed their meaning to avoid constitutional problems. *Id.* at 13. The doctrine worked there because the surrounding words provided genuine guidance about the legislative intent to resolve a vagueness concern that inhered in the two words used. *Id.* No such ambiguity exists here. As the majority acknowledges, "promote" has a clear, sensible meaning that serves the Legislature's stated purpose.

The use of *noscitur a sociis* is of little value here because "promote" was added to section 9-805 six years after the statute was first drafted. So, although the original list of proscribed activities connoted a managerial role, that connotation inhered in the words themselves. It does not mean that the words added later—which do not connote such a role—were intended to take on the inherent connotations of the incumbent ones. Otherwise, to avoid limiting the reach of "promote" in that fashion, the General Assembly would have had to create an entirely separate section for "promote." That strikes me as an unreasonable and unwarranted expectation of legislative drafting.

8

**B**

The majority's reliance on legislative history to support its interpretation fundamentally misunderstands how legislative history should inform statutory construction. Properly applied, the legislative history here undermines, rather than supports, the majority's position.

The following individuals served on the sponsor panel and provided oral testimony: Brett Wilson, Delegate; Steven J. DeBoy, Sr., Deputy Legislative Officer in the Office of the Governor; Wes Adams, State's Attorney for Anne Arundel County; Brian DeLeonardo, State's Attorney for Carroll County; Vince Canales, President of the Maryland State Fraternal Order of Police; Steve Kroll, Director of the Maryland State's Attorneys' Association; and Major Charles Hamby, representing the Maryland Chiefs of Police Association.[2] Notably, there was no testimony in opposition to the bill.

---

[2] In recent years, this Court has continued the practice of relying on sponsor testimony for legislative intent when analyzing legislative history. *See Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 563-65 (2025) (referring to statements from the bill sponsor at a House hearing as significant to understanding whether a particular provision in the bill constitutes a statute of repose); *Syed v. Lee*, 488 Md. 537, 608 n.30 (2024) (pointing to the testimony of one of the bill sponsors as an indicator that the Legislature had been concerned with the right of victims to be heard if desired); *Buarque de Macedo v. Auto. Ins. Co. of Hartford, Conn.*, 480 Md. 200, 224-25 (2022) (indicating support from bill sponsors as integral to the legislative history analysis of the statute at issue); *Blackstone v. Sharma*, 461 Md. 87, 122 (2018) (relying on submitted testimony from the bill sponsor to bolster a plain meaning interpretation and to further develop the legislative history); *Davis v. State*, 426 Md. 211, 222, 231 n.7 (2012) ("We rely on the testimony of the bill sponsor in determining the legislative intent; especially where there were minimal amendments to the bill introduced after that testimony."); *State v. Johnson*, 415 Md. 413, 429 (2010) (highlighting the testimony of Delegate Salima Marriott that specific persons "receive one review of their mandatory minimum sentence[]" as backing "that the General Assembly intended that individuals granted the right to sentence review

Three House Judiciary Committee members raised specific concerns about the use of the word "promote" in CR § 9-805(a). The majority relies on these concerns to raise doubt that the word "promote" would reach street-level gang members. I draw the opposite conclusion: Such concerns reflected no confusion about its meaning or scope, but rather a disagreement about whether a word with that reach was appropriate. That "promote" was kept in the final bill reflects that the concerns of some legislators notwithstanding, the General Assembly intentionally used "promote" precisely for its breadth, to address the problem of young people being recruited into gangs.

Delegate David Moon's questions illustrate this point. He asked whether "some street-level dealer that's a member of a three-person gang might be promoting the gang and then subject to 20 years and a million bucks." *Hearing on H.B. 461 Before the H. Judiciary Comm.*, 2016 Leg., Reg. Sess. 1:47:49-1:48:02 (Md. 2016) (statement of Del. David Moon). Mr. DeBoy responded, "I didn't write the bill but that must be the intent because that's why they put it in there." *Id.* at 1:48:03-1:48:07 (statement of Deputy Legis. Officer, Off. of Governor, Steven J. DeBoy, Sr.). This exchange shows that Delegate Moon understood that "promote" could apply to street-level members.

Delegate Moon suggested that the word promote "might be a little overbroad." *Id.* at 1:48:07-1:48:10 (statement of Del. David Moon). State's Attorney Wes Adams explained that:

> the rationale behind that is really to curtail the proliferation of the gang and the size of it, and so, you know, obviously a lot of the drafting here is

under the legislation's provisions would have but one opportunity to seek review of their sentence by a three-judge panel" (emphasis omitted)).

10

attempting to stop what we see which is the going out and recruiting, so where the promoting and sponsoring is, and I know you're talking about a three-person gang, but those three-person gangs turn into ten, and twelve, and fifteen, and twenty, and if we can curtail that effort through deterrence that would be a far better way than losing kids to the gangs and the drug trade.

*Id.* at 1:48:20-1:48:54 (statement of Anne Arundel Cnty. State's Att'y Wes Adams).

Delegate Vanessa Atterbeary also understood that "promote" could encompass low-level activities, as reflected in this question:

When you look at the language that says promote, so if somebody promotes a gang and they could be subjected to a million-dollar fine or prison of 20 years, so you could possibly be a teenage kid trying to impress, you know, a girl and saying you were in some gang, and then you could be subjected to this? . . . And then the follow-up question to that is—is that at the judge's discretion or State's Attorney would say this is what we're seeking?

*Id.* at 1:57:26-1:57:56 (statement of Del. Vanessa Atterbeary).

State's Attorney Adams responded:

The ultimate decision, as in pretty much every crime that comes before us in the State's Attorney's office, would be to determine whether or not the person actually committed a crime or whether or not you have what you are talking about—some mere puffery or a kid sort of trying to inflate his status to engage in conversation. Obviously, any sentencing would be left to the judge. The discretion to bring the charges, though, would rest with the prosecutor's office.

*Id.* at 1:57:58-1:58:28 (statement of Anne Arundel Cnty. State's Att'y Wes Adams).

Then Delegate (and now Judge) Brett Wilson, who also served as a member of the Heroin and Opioid Emergency Task Force (discussed below), endorsed this broad understanding. *Id.* at 2:12:19-2:13:18 (statement of Del. Brett Wilson). When addressing Delegate Moon's concerns about teenage promotional conduct, he clarified that "promotion in a gang is often the extortion, the fear, the threat, the type of duress it takes

11

to bring young people into the gang." *Id.* at 2:12:44-2:12:53. He also expressed a willingness to consider alternative language but stressed that promotion is a fundamental strategy that criminal organizations use to expand operations. *Id.* at 2:12:57-2:13:17, 2:18:22-2:18:38.

Then Delegate (and now Judge) Kathleen Dumais expressed concern about the word "promot[e]" and suggested that the definitions used in the federal justice reinvestment statute could serve as a model for revising the language of the bill. *Id.* at 2:16:15-2:17:23 (statement of Del. Kathleen Dumais). In response, Delegate Wilson expressed the sponsors' willingness to work with the House Judiciary Committee on alternative words or definitions. *Id.* at 2:18:22-2:18:40 (statement of Del. Brett Wilson).

Delegate Wilson further explained the difficulties under the then-current law to "go after that big fish": "[W]e are not going to be able to go after that big fish unless we can catch that person dirty with the drugs." *Id.* at 2:17:46-2:17:55. Under the proposed bill, law enforcement would have the ability to arrest the street-level dealer or promoter, and through them reach the big fish, "and that's really what the intent is." *Id.* at 2:18:03-2:18:08. Delegate Wilson's testimony reflects an understanding that "promote" was intended to reach street-level recruitment activities.

The Heroin and Opioid Emergency Task Force's report, which provided the impetus for this legislation, explicitly recognized the need to target "street level narcotics operations too small for the federal authorities to touch."[3] Heroin & Opioid Emergency Task Force,

---

[3] The Heroin and Opioid Emergency Task Force was created by executive order to provide recommendations for a coordinated statewide and multi-jurisdictional effort to

12

*Final Report* 17 (Dec. 1, 2015). The Task Force recommended changes to capture "the broad array of crimes that are present in many of the street level narcotics operations[,]" *id.*, demonstrating that the underlying policy goal was to reach street-level actors, not just kingpins.

State's Attorney Wes Adams's testimony confirms this understanding. When asked about Delegate Moon's concern, he didn't claim the statute was limited to kingpins—instead, he acknowledged that the reach of "promote" would be a matter of prosecutorial discretion. He explained that "the ultimate decision . . . would be to determine whether or not a person actually committed the crime or whether or not you had what you are talking about—some mere puffery or a kid sort of trying to inflate his status." *Hearing on H.B. 461 Before the H. Judiciary Comm.*, 2016 Leg., Reg. Sess. 1:57:59-1:58:16 (Md. 2016) (statement of Anne Arundel Cnty. State's Att'y Wes Adams). State's Attorney Adams also emphasized that the "rationale behind that is really to curtail the proliferation of the gang and the size of it" through targeting recruiting activities, confirming the statute's intended reach to street-level promotional conduct. *Id.* at 1:48:20-1:48:55.

Tellingly, despite expressed concerns about breadth, no legislator proposed amendments to narrow the word "promote." When Delegate Moon asked directly whether the sponsors were "open to amending that off," they expressed an openness to amendments and suggested alternative language like "recruit." *See id.* at 2:00:20-2:01:10 (statements of

---

prevent, treat, and significantly reduce heroin and opioid abuse, and the growing crisis of overdose deaths. The 11-member task force, which included Delegate Brett Wilson, issued a report in December 2015 that included 33 recommendations for policy, regulations, and legislation. *See* Heroin & Opioid Emergency Task Force, *Final Report* (Dec. 1, 2015).

Del. David Moon, Anne Arundel Cnty. State's Att'y Wes Adams, and Deputy Legis. Officer, Off. of Governor, Steven J. DeBoy, Sr.). Ultimately, however, no amendments to substitute or delete the word "promote" were offered when the entire text of H.B. 461, the criminal gang statute, was engrafted onto H.B. 1312, the Justice Reinvestment Act, during a voting session of the House Judiciary Committee. The committee vote was 17-3 in favor of combining these two bills, with Delegates Moon and Atterbeary—the very legislators who had expressed concerns—voting in favor.

The Judiciary Committee voted a second time to retain the word "promote" when it conformed S.B. 1005, the Senate version of the Justice Reinvestment Act, to the House bill. The Conference Committee Report on S.B. 1005 retained the entire text of the criminal gang statute, including the word "promote," and it passed the House (123-18) and Senate (46-0) on its third reading.

Throughout this process, the General Assembly had multiple opportunities to delete the word "promote" or adopt narrowing language—during committee markup, floor debate, or conference committee deliberations. This legislative inaction undermines the majority's interpretation. If the legislators believed "promote" was too broad for the statute's intended purpose, they possessed the power to amend it. Their failure to do so while passing the bill by decisive margins reflects a conscious choice to retain the plain and unambiguous meaning of the word "promote," notwithstanding the concerns of some legislators. The majority's interpretation effectively rewrites the statute based on the policy preferences expressed by a few legislators, rather than the actual text that the General Assembly enacted. This practice, in my view, will encourage legislators to provide self-

14

serving testimony to support their policy preferences and discourage legislators from offering and negotiating for language that clearly reflects their policy choices.

\* \* \*

In sum, I agree with the opinion of the Appellate Court of Maryland and would hold that the evidence was sufficient to convict Mr. Williams. Accordingly, I respectfully dissent.

Justice Getty has authorized me to state that he joins in this dissent.